# WASHINGTON, BALTIMORE AND ANNAPOLIS ELECTRIC RAILROAD COMPANY

*vs.*

## BOYD FAULKNER, An Infant, by His Next Friend, Ettie Bond.

*Street Railways—Accident at Crossing—Last Clear Chance— — Impeaching One's Own Witness—Hospital Record— Harmless Error—Exception to Prayers.*

In an action on account of injuries caused by an accident at a street crossing, which occurred about the middle of the day, error in allowing a witness to be asked whether defendant company had not had a watchman at this crossing, was harmless in view of the answer that it had done so only in the evenings under special circumstances not existing at the time of the accident.                                                                 p. 457

That the hospital record of plaintiff's case was admitted for the purpose of showing his temperature while at the hospital did not render admissible another part of such record which purported, as part of the "history" of the case, to state the way in which the accident occurred.                           pp. 458, 459

Where a witness has made to a party, or to his attorney, who calls him, a statement totally variant from his sworn testimony, and on the faith of such statement he has been called, he may be asked if he made such statement and, if he denies it, that he did make it may be proved by anyone who heard him do so.                                                                 p. 461

That plaintiff, in questioning witnesses called by him for the purpose of showing that another witness called by him made, before the trial, a statement to plaintiff's counsel not in accord with his testimony, did not strictly limit his examination of the former witnesses to the questions asked the latter witness, and to the statement made to counsel, *held* not cause for reversal on defendant's appeal, the obvious purpose and only effect of the evidence being to show why plaintiff had called the latter witness.                                                         p. 461

That a witness was allowed to state what one of plaintiff's witnesses had repeated to plaintiff's counsel, before the trial, as having been said to him by another of plaintiff's witnesses, about testifying in the case, although inadmissible as hearsay, *held* harmless in view of the fact that such statement did not contradict the testimony of the latter witness, but merely involved a request to the former witness not to mention a certain matter in his testimony.                                   p. 462

The law imposes on a company operating its cars or trains on the streets of a city the duty to keep a sharp lookout and its car or train under control as it approaches a crossing, in order to avoid injuring those who may be crossing the street.    p. 463

In an action for injuries received by a child, as a result of his being struck by defendant's train and thrown on the adjoining track, where he was run over by another of defendant's trains, *held* that it was proper to refuse to direct a verdict for defendant, even if plaintiff was guilty of contributory negligence in attempting to cross in front of the first train, in view of evidence that the motormen of both trains could, in the exercise of reasonable care, have seen him in time to avoid the accident.

p. 463

The action of the trial court on the prayers is regarded as a single act, and an exception to a ruling on special exceptions to prayers is therefore properly included in the bill of exception to the ruling on the prayers.                               p. 467

*Decided January 12th, 1921.*

Appeal from the Baltimore City Court (GORTER, J.).

The cause was argued before BOYD, C. J., THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*George Weems Williams* and *L. Vernon Miller,* with whom were *Marbury, Gosnell & Williams* on the brief, for the appellant.

*J. Cookman Boyd,* with whom was *Thomas Evans Mason* on the brief, for the appellee.

THOMAS, J., delivered the opinion of the court.

This suit was brought by the appellee to recover for injuries alleged to have been caused by the negligence of the appellant, the Washington, Baltimore & Annapolis Electric Railroad Company, and the present appeal brings up for review the rulings of the court below on the evidence embraced in twenty-two bills of exception, and its action on three prayers offered by the plaintiff and nineteen offered by the defendant.

The accident happened about 12 o'clock noon on the 19th of October, 1918, at the intersection of Scott Street and Columbia Avenue, in Baltimore City, where the double track railroad of the appellant on Scott Street crosses the tracks of the United Railways and Electric Company on Columbia Avenue. Scott Street runs north and south and Columbia Avenue east and west, and the distance from McHenry Street, the second street crossing Scott Street to the north of Columbia Avenue to Columbia Avenue, is about six hundred and twenty-six feet, while the distance from Columbia Avenue to Hamburg Street, which crosses Scott Street to the south of Columbia Avenue, is eight hundred and six feet. The first street crossing Scott Street north of Columbia Avenue is Ramsay Street, which is about two hundred and seventy-eight feet from Columbia Avenue, and the first street crossing Scott Street south of Columbia Avenue is St. Peter Street, which is about three hundred and ten feet from Columbia Avenue. From McHenry Street, north of Columbia Avenue, to Hamburg Street, south of Columbia Avenue, the tracks of the appellant are practically straight and level, with a slight decline or down-grade from McHenry Street to Columbia Avenue. The cars or trains of the appellant when coming to Baltimore from Washington, or from intermediate points, which run north on Scott Street, and those going from Baltimore to Washington, or to intermediate points, which run south on Scott Street, stop at Columbia Avenue to discharge and take on passengers. The company erected or

posted signs at the intersection of Scott Street and Columbia Avenue stating, "Cars stop here," and the general manager of the company testified that the rules of the company given to conductors and motormen required the trains to stop at all "rapid transit intersections," and "that Columbia Avenue was one of these." There were two trains of the appellant involved in the accident—one coming from Washington and spoken of as the northbound train, consisting of a motor car, or motor, and five trailers, and the other going from Baltimore, called the southbound train, consisting of a motor and three trailers. The space between the west rail of the northbound track and the east rail of the southbound track, called the "dummy," was about four feet and six or seven inches wide. The width of the motor cars, or motors, was about nine feet, and the width of the trailers was about eight feet. "The clearance" between the side of a motor on one track and the side of a trailer passing on the other track was about thirteen inches, and the "clearance" between two motors was less.

The plaintiff at the time of the accident was thirteen years of age, and, according to his version of what occurred, he received the injuries complained of, which resulted in the amputation of both of his legs, while he was attempting to cross from the southeast to the northwest corner of Columbia Avenue and Scott Street. When asked to state exactly what happened the plaintiff said: "I left the news office on the corner of Columbia Avenue and Scott Street and I walked up to the corner store at Scott Street and Columbia Avenue and as I got to the corner I looked down Scott Street to see if there were any W., B. & A. cars coming up, and I looked down and I saw one about a square and a half below Columbia Avenue and I started to walk across towards Fagan's saloon and as I got to the center of the crossing I looked up Scott Street and I seen a W., B. & A. car turn out of McHenry Street into Scott Street and the next thing the W., B. & A. car came and struck me and knocked me down on

the southbound track and the southbound car cut my legs off and before the southbound car cut my legs off I tried to crawl out of the way and the southbound car ran over me and that is the last I remember until I woke up in the hospital." He further testified that he sold newspapers and had been to the news office to get some papers, and that finding that they had not arrived he started across the street to go to Bartlett & Hayward's "to watch the people come out," and that he did not hear any bells rung before he was struck. The testimony of the plaintiff was corroborated by a number of witnesses, who stated that they saw the accident, and further testified that the plaintiff was struck and knocked over on the southbound track by the northbound train, and that the southbound train ran over him; that there was nothing in the street to prevent the motorman of the northbound train or the motorman of the southbound train from seeing the plaintiff; that both trains were running very fast; that neither one of them stopped at Columbia Avenue, and that the northbound train did not stop until the rear car or trailer was just beyond the north side of Ramsay Street, when the conductor got out and went back to where the plaintiff was struck.

The evidence produced by the defendant gives a very different account of the accident. The motorman of the northbound train testified that both trains reached Columbia Avenue about 12 o'clock, and that the southbound train stopped at the north side, and the northbound train at the south side of Columbia Avenue to discharge three passengers; that the southbound train started from Columbia Avenue just a little before the northbound train started; that just as he started and his motor was approaching the intersection at about the speed a man would walk, the plaintiff and several other boys ran across the street and started to jump on the southbound train; that the plaintiff was behind the other boys and ran right in front of him; that the moment he saw him he blew his whistle and "threw the air into emergency" and stopped his train on the intersection, and that as the plaintiff passed

456   WASH., B. & A. R. R. CO. vs. FAULKNER.

Opinion of the Court.                               [137

him he jumped on the front steps of the last car of the south-
bound train and was hanging on the steps, "with his hips
hanging out this way (indicating)," when the southbound
train passed him, the witness, and that he knew he was in
danger; that he heard something "that felt like somebody
had thrown a stone against the side of the motor," and that
he told the conductor "to look on the other side to see if that
boy had cleared on the southbound train"; that he got down
off of his motor and saw the plaintiff lying between the two
tracks; that the bumper or front part of his motor did not
strike the plaintiff, for he saw the plaintiff as he was pass-
ing by while hanging on the steps, and that from where the
plaintiff was lying, and "from where he heard the lick," he
must have struck the "grab handle" of the baggage car door—
the front door on the side of the motor of the northbound
train; that after going to where the boy was lying he was
ordered by his conductor to move his train off the crossing
in order to clear the tracks for a Columbia Avenue car which
was waiting at the crossing, and that he then moved his train
up to the north side of Ramsay Street. This testimony of
the motorman was corroborated by the crews of the north
and southbound trains, the motorman of the Columbia Ave-
nue car, and by a number of disinterested witnesses. Dr.
Holland, who operated on the plaintiff and who attended him
while he was at the University Hospital, stated that his
recollection was that the plaintiff told him that "he jumped
on one car and as he jumped off he was struck by a car on
the other side going in the opposite direction," and Mrs. Mac-
Question, another witness for the defendant, who was em-
ployed at the hospital and who wrote the "history" of the
case, testified that about six weeks after the accident the
plaintiff, when asked by her, "why he did this," replied that
"he was playing on the street and the W., B. & A. car was
moving along slowly and he jumped on to take a ride, and
he didn't realize he was in the middle of the tracks instead
of on the outside, and that another car came along and he

was dragged off the car on which he was riding and was run over by the car on which he was riding."

The sixth, ninth, tenth, eleventh, sixteenth, seventeenth and twenty-second exceptions were not pressed in this Court, and the exceptions to the evidence chiefly relied on by the appellant were the first and second, the twelfth, thirteenth and fourteenth, and the eighteenth, nineteenth, twentieth and twenty-first.

The plaintiff called as a witness James J. Doyle, the general manager of the appellant, who stated that the appellant did not have a watchman at the corner of Columbia Avenue and Scott Street at the time of the accident or at the time he was testifying, and the first exception was to the action of the court in permitting the plaintiff to ask the witness: "Haven't you had a watchman there?" The witness replied that during the "evening hours when the race meets are on we have placed a watchman there during the time when the trains are coming in from the race track." The second exception was to the further question: "And during the race meets you have had a watchman there since 1914?" To which the witness replied: "For two hours each evening during the race period." * * * "That is, in the evening and not during the day." The obvious purpose of the questions was to get from the witness a statement that the company *generally* had a watchman at the crossing in question so that the jury might infer that the company was negligent in failing to have one there at the time of the accident. While no circumstances had been shown that would impose upon the company the obligation to keep a watchman at the crossing (*North. Cent. Ry. Co.* v. *Medairy,* 86 Md. 168; *Cowen* v. *Dietrick,* 101 Md. 46, and *Evans* v. *B. C. & A. Ry. Co.,* 133 Md. 31), and the questions were not proper, it is apparent that the plaintiff failed in his purpose, for the answers of the witness were to the effect that the company had never had a watchman at the crossing except for about two hours in the evening when the trains were coming from the race

458   WASH., B. & A. R. R. CO. vs. FAULKNER.

Opinion of the Court.                    [137

track.   The accident referred to occurred about the middle
of the day, and we do not see how the fact that the company
employed a watchman only at a certain hour in the evening
and under the special circumstances stated, could have led
the jury to the conclusion that it should have had one at a
different hour in the day, and under entirely different cir-
cumstances, or how the defendant could have been prejudiced
by the testimony of the witness.

The twelfth, thirteenth and fourteenth exceptions are to
the refusal of the court to admit in evidence a record made
at the hospital of the various patients, and particularly that
part of it containing the "history" of plaintiff's admission
into the hospital, his age, name, complaint, family history,
and what purported to be a statement of how the accident
occurred.   Dr. Holland, in his examination in chief, testified
to the statement made to him by the plaintiff while he was
in the hospital, to which we have already referred, and on
cross-examination, presumably with the view of showing that
he was not in a condition to make such a statement, Dr.
Holland was asked by counsel for the plaintiff to give the
plaintiff's temperature for each day during the first six or
seven weeks he was in the hospital.   Dr. Holland stated that
he could not give it from memory, but could do so by re-
ferring to the "record," which contained the "chart" indi-
cating the plaintiff's temperature on each day.   He was told
by plaintiff's counsel to refer to the record, and after doing
so and testifying to the temperature, the witness said that
the black line on the "chart" immediately above ninety-eight
indicated a normal temperature, and counsel for the plain-
tiff then proposed to show the "chart" to the jury, to which
the defendant objected unless the whole "record" was ad-
mitted in evidence, and particularly that part of it contain-
ing what we have spoken of as the "history."   The court
overruled the objection and permitted the plaintiff to offer
the "chart" in evidence without offering the whole record.
On re-direct examination of the witness the defendant first

offered that part of the "record" containing the history, and then offered the entire record. The evidence was objected to by the plaintiff and the court sustained the objections, and the rulings mentioned are the ones referred to in these three exceptions. The contention of the appellant is that, as the plaintiff had offered in evidence the "chart" showing the temperature of the plaintiff, the entire record was thereby put in evidence. The purpose of the defendant was to get before the jury that part of the "history" which contained the following statement as to how the accident occurred: "Present illness. On October 19th, 1918, when he jumped on a W., B. & A. car while selling papers fell from the car when a car passing in the opposite direction striking his head, and this is the last he remembers until he woke up at the University Hospital to find both legs amputated and head bandaged." This statement was not a part of the "chart," and did not contain any explanation of it; it was not a record of the condition of the plaintiff while in the hospital, or of any treatment he received while there, and there was no evidence before the court as to how the record was made, who wrote the statement, or from what source the writer obtained his or her information. It is, therefore, clear that the statement was not, under the circumstances, admissible for any purpose. The doctor had been allowed to use the chart, without objection, in giving the temperature of the plaintiff, and after he stated that the black line on the chart indicated a normal temperature counsel for the plaintiff showed the chart to the jury. The defendant was not injured by the introduction of the chart, and the fact that it was admitted in evidence would not have justified the introduction of the *statement* referred to, even if the "history" was so attached as to indicate that it was intended to be a part of the hospital record. The admission of such evidence under the rule invoked by the appellant would have established a dangerous precedent, and one not warranted by the meaning and purpose of the rule. 1 *Greenleaf on Evidence* (16th Ed.), Secs.

201, 201a and 202; 3 *Wigmore on Evidence,* Sec. 2113. Mrs.
MacQuestion later testified, however, that she wrote the "his-
tory," and that the plaintiff made to her the statement we
have already quoted from her testimony, so that the defend-
ant got the benefit of the statement contained in the "his-
tory" excluded by the court below.

The eighteenth, nineteenth, twentieth and twenty-first ex-
ceptions are to the testimony of the witness Frank Fox. Wil-
liam H. Swallenberg, the conductor on the northbound train,
testified that the train stopped at the corner of Scott Street
and Columbia Avenue to discharge some passengers; that
after the passengers left the train, and the train had started,
it came to an "emergency stop," and the motorman called to
him to look and see if that boy hanging on the southbound
train cleared the motor; that he looked over and saw the boy
lying on the east rail of the southbound track and immedi-
ately went to him; that while he was with the boy the motor-
man came to him and told him that they had the Columbia
Avenue car of the United Railway Company blocked; that
he told the motorman to get on his motor, and the train was
then pulled up to Ramsay Street. On cross-examination he
stated in reply to questions by counsel for plaintiff that he
did not remember being at the Suburban Club or Hotel Ker-
nan with Miss Campbell, another lady, and Mr. Cornelius,
about two months after the accident, and that he did not
state, about two months after the accident, to Miss Campbell,
in the presence of the other lady and Mr. Cornelius, at the
Suburban, that the first time he knew of the accident was
when his train stopped at Ramsay Street. The plaintiff in
rebuttal produced Miss Campbell, who testified to the state-
ment made by Mr. Swallenberg at the time and place men-
tioned. The plaintiff also called Cornelius, who, after he
stated that he had never been at the Suburban and did not
remember being at the Hotel Kernan with the parties men-
tioned, was asked if he remembered telling counsel for plain-
tiff, in the court room, on the Friday previous to his exam-

ination, "that you were present at the Suburban and"—
and he replied, "I did not." He was then asked if he did
not at the same time make the further statement to counsel
that Swallenberg had been to see him and begged him not
to go on the stand as it would break up his home if he did,
and he replied, "No, he told me I would be summoned in
court." The plaintiff then called Frank Fox, who, after stat-
ing he remembered the conversation Cornelius had with him
and counsel for plaintiff in the court room on "last Friday
afternoon," was asked: "What did he say?" And he replied,
"He said that they did go to Kernan's and had lunch, and
then got a Brown taxi and went to the Suburban." The
eighteenth and nineteenth exceptions were to the overruling
of an objection to the question and to the refusal of the court
to strike out the answer of the witness. The twentieth ex-
ception was to the overruling of the objection to the question:
"What, if anything, was said about a conversation in refer-
ence to the accident?" to which the witness replied: "He
said Swallenburg, the conductor, did say it." A party is
not allowed to impeach his own witness, but "where a wit-
ness has made to a party, or his attorney, who calls him,
a statement totally variant from his sworn testimony, and
on the faith of such statement he has been called, he may be
asked if he made such statement, and if he denies it, there
is no objection to the proof of such statement, not for the
purpose of impeaching his general character as a witness
* * * but because the principles of justice require that the
plaintiff should be allowed to show why he called him." *B.
& O. R. Co.* v. *Black,* 107 Md. 642; *Smith* v. *Briscoe,* 65
Md. 561. The rule applies only to statements made to a
party or his counsel, but there is no reason why the state-
ment so made to a party or his counsel may not be proved
by any one who heard the witness make it. While counsel
for plaintiff did not follow strictly the requirement limiting
the examination of Cornelius to the questions asked Swallen-
berg, and the examination of Fox to the statement made by

Cornelius to plaintiff's counsel, the obvious purpose and only effect of the evidence referred to in these exceptions was to show why Cornelius had been called as a witness by the plaintiff. The evidence referred to in the twenty-first exception was entirely outside of the rule stated. There Fox was asked and allowed to state what Cornelius told plaintiff's counsel Swallenberg had said to him, Cornelius, about testifying in the case. If what Swallenberg said to Cornelius about testifying was admissible at all, it could only have been proved by some one who heard him say it, and the evidence of Fox was mere hearsay and clearly inadmissible. But according to this evidence, what Swallenberg said to Cornelius was, in effect, that he did not want him to testify about his having been out with these two ladies because if he did it would ruin his home and cause him to be discharged by the appellant. There was no intimation in what Swallenberg is claimed to have said to Cornelius that he, Swallenberg, made the statement to Miss Campbell which he denied having made on cross-examination, and to which Miss Campbell testified, and the natural inference is that he did not want it to be known that he was "out with these two ladies" for fear that it would affect his home and cause his discharge by the appellant company. What Swallenberg positively denied on cross-examination was that he made the statement referred to to Miss Campbell in the presence of the other parties mentioned, and he said he did not remember being at the Suburban or Kernan's Hotel with them, and it is not probable that the jury could have been misled to the prejudice of the defendant by the evidence in this exception.

In regard to the other exceptions to the evidence, it is only necessary to say that we have carefully examined them and discover no error in any of the rulings.

This brings us to a consideration of the prayers. The court below granted the three prayers offered by the plaintiff and all of the defendant's prayers except its second, fourth, fifth, fourteenth, fifteenth, and seventeenth. The objection

to the defendant's rejected prayers is that they overlook the evidence produced by the plaintiff tending to show that the trains did not stop at the intersection of Scott Street and Columbia Avenue, but passed the crossing while running fast; that the tracks were straight and clear, and that the motorman on the northbound train could, by the exercise of reasonable care, have seen the plaintiff in the act of crossing the street in time to have avoided striking him; that the motorman of the southbound train could, by the exercise of the same care, have seen him on the southbound track in time to have avoided running over him, and the duty the law imposes on a company operating its cars or trains on the streets of a city to keep a sharp lookout and its car under control as it approaches a crossing in order to avoid injuring those who may be crossing the street.

In the case of *United Rys. Co.* v. *Kolken,* 114 Md. 160, this Court said: "It is the duty of those in charge of a car to keep a sharp lookout as they approach a street crossing, and to slacken the speed of the car sufficiently to enable them to have it under control, so as to avoid injuring those who may be crossing the street, and the evidence adduced by the plaintiff tended to show not only that the defendant was negligent in the management of its car, but that the motorman saw, or by the exercise of proper care could have seen, the plaintiff in time to have stopped the car before it struck her.   Under such circumstances, it would have been error to have taken the case from the jury upon either of the grounds stated in the first and second prayers, or to have instructed the jury that if they found that the plaintiff was negligent she was not entitled to recover, for even if the plaintiff was guilty of contributory negligence in attempting, under the circumstances, to cross the street in front of the approaching car, she was still entitled to recover if the motorman could, by the exercise of due care, have avoided the accident, after he saw or, by the exercise of proper care, might have seen the plaintiff as she was about to cross the tracks.   This is the

rule that has been repeatedly recognized by this Court as applicable to cases like the one at bar. *Lake Roland Co.* v. *McKewen,* 80 Md. 593; *Baltimore Traction Co.* v. *Appel,* 80 Md. 603; *Consolidated Ry. Co.* v. *Rifcowitz,* 89 Md. 338; *United Railways Co.* v. *Ward,* 113 Md. 649.

"In *McKewen's case,* the prayer which this Court said was 'quite as favorable to the defendant as it had any right to expect,' instructed the jury that the plaintiff was guilty of contributory negligence, and was not entitled to recover, 'unless the jury believe from the evidence that the motorman of the car in question, after he saw or, by the exercise of due care, might have seen that the plaintiff was approaching the track and was apparently about to cross in front of his car, and that the attempt to do so would be dangerous to the plaintiff, might still, by the exercise of reasonable care in the management of said car, have avoided the collision, but failed to exercise said care.' In the case of *Consolidated Ry. Co.* v. *Rifcowitz, supra,* the defendant offered a prayer instructing the jury that the plaintiff's evidence was not satisfactory or legally sufficient to entitle her to recover, and the court below granted it after having modified it by adding these words: 'unless the jury shall further find that after the motorman saw, or could reasonably have seen, the peril of the plaintiff, he failed to exercise ordinary care to avoid the accident.' In reference to this prayer, the Court said: 'The modification which the learned judge below made in the first prayer of the defendant before granting it was an entirely proper one, and was requisite to make it conform to the law governing the case. * * * Mere negligence or want of ordinary care will not disentitle a paintiff to recover if the defendant might, by the exercise of care on his part, have avoided the consequence of the neglect or carelessness of the plaintiff. * * * If the court had not modified the prayer, it would have taken from the jury the question of relative negligence of the parties.' In the later case of *Consolidated Ry. Co.* v. *Armstrong,* 92 Md. 554, counsel for the company insisted that the

rule we have stated, or rather the modification of the doctrine of contributory negligence, should be limited to cases in which the defendant could have avoided the accident by the exercise of due care after he actually saw the plaintiff's peril, but this Court refused to adopt that view, and said: 'It cannot be seriously contended that when the defendant is in a position from which he ought to see or, by the exercise of reasonable care, could see the plaintiff's peril, he may avert his face or close his eyes and not see it, and then escape liability for an injury resulting from such conduct on his part. * * * The law will not permit the loss of life or limb or even property to be deliberately or carelessly inflicted, when it could by reasonable care and caution be averted, merely because the injured person was negligent.' And in *Ward's case* we said: 'But even if we assume that the appellee did not, before attempting to cross the tracks, look to see if a car was approaching, and that he was to that extent negligent, the court below would not have been justified in directing a verdict for the defendant on the ground of contributory negligence, or because there was no evidence of negligence on the part of the defendant. * * * If the motorman in charge of the car in question saw the appellee, or by the exercise of due care could have seen him in the act of crossing the tracks in time to have prevented the accident, it was his duty to have stopped the car in time to avoid the collision; and if the accident occurred by reason of his failure to do so under such circumstances, his negligence, and not the negligence of the appellee, was the proximate cause of the injury.'

"Learned counsel for the appellant, while recognizing the rule referred to, contend that it does not apply to the case at bar, because here the plaintiff saw the car as she started across the street. But it can make no difference in the application of the principle whether the plaintiff's negligence consisted in venturing across the street without looking to see if a car was coming or in attempting to cross after seeing the approaching car; the rule relates to the duty of the defendant

after the motorman saw or, by the exercise of reasonable care, could have seen her peril. Counsel for the appellant, relying upon cases like the case of *McNab* v. *United Railways Co.,* 94 Md. 728, further contend that even if the motorman saw the plaintiff crossing the street, he had a right to assume up to the very moment she stepped on the tracks that she would not venture to cross until after the car had passed, and that the last act of negligence was committed by her. In *McNab's case* the accident happened at a crossing in the open country, where cars are permitted and known to run at much greater speed than is allowed on the streets of a city, and JUDGE McSHERRY, quoting from *Neubeur's case,* 62 Md. 401, said: 'It was not the duty of those in charge of the train to anticipate the conduct of the plaintiff, and because they saw him approach the crossing to conclude that he would attempt to cross in advance of the train.' But, as was distinctly recognized in that case, a very different rule applies to the running of cars on the crowded thoroughfares of a city, where the motorman is required to anticipate the conduct of those crossing the streets to the extent of keeping a sharp lookout, giving proper warning, and reducing the speed of his car so as to have it under control for the purpose of avoiding injury to those who may be on the crossing."

We have quoted at length from *Kolken's case* because it clearly points out the objections to the defendant's rejected prayers and shows that the special exceptions to plaintiff's prayers were properly overruled. A careful reading of the cases of *Balto. Consolidated Ry. Co.* v. *Armstrong* 92 Md. 554; *Garvick* v. *United Rys. Co.,* 101 Md. 239, and *State* v. *W., B. & A. Elec. R. Co.,* 130 Md. 603, will show that they are not in conflict with *Kolken's case,* and that they do not support the defendant's rejected prayers under the circumstances disclosed by the record in this case.

The jury were fully and properly instructed by the granted prayers, and as we find no reversible error in any of the rulings excepted to, the judgment must be affirmed.

Counsel for the appellee suggest in their brief that the exception to the ruling of the court below on the special exceptions to plaintiff's prayers should not have been included in the bill of exception to its ruling on the prayers, and rely upon the statement of this Court in *Fast* v. *Austin,* 135 Md. p. 21.   While the record of that case is not now before the writer of this opinion (who also wrote the opinion in that case) and he does not recall whether there was anything in that record to suggest the statement, before concluding this opinion, and to avoid any confusion in the practice, we desire to say that according to the rule and practice sanctioned by this Court, the action of the trial court on the prayers is regarded as a single act, and an exception to a ruling on special exceptions to prayers is therefore properly included in the bill of exception to the ruling on the prayers.

*Judgment affirmed, with costs.*